# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DAVID BEAN, | : | CIVIL ACTION NO. |
| Plaintiff, | : | 3:11-CV-01737 (VLB) |
| | : | |
| v. | : | |
| | : | |
| DAVITA, INC., d/b/a DAVITA RX, LLC, | : | |
| Defendant. | : | September 30, 2014 |

## MEMORANDUM OF DECISION GRANTING IN PART DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT [Dkt. #35] AND DISMISSING THE REMAINING COUNTS FOR LACK OF SUBJECT MATTER JURISDICTION

I.      **Introduction**

The Plaintiff, David Bean ("Bean"), brings this action alleging the Defendant, DaVita Inc., ("DaVita"), retaliated against him in violation of the Family Medical Leave Act, 29 U.S.C. § 2601, *et seq.*, (the "FMLA"). Bean also brings claims under Connecticut state law for breach of contract, breach of implied contract, breach of the implied covenant of good faith and fair dealing, and intentional and negligent infliction of emotional distress, for injuries he allegedly sustained prior and during his leave of absence pursuant to the FMLA. Currently pending before the Court is the Defendant's Motion for Partial Summary Judgment. For the reasons that follow, the Defendant's Motion for Partial Summary Judgment is GRANTED in part, and the remainder of Plaintiff's complaint is DISMISSED for lack of subject matter jurisdiction.

1

II.    <u>Factual Background</u>

The following facts relevant to the Defendant's Motion for Summary Judgment are undisputed unless otherwise noted.

David Bean was employed by DaVita from April 2009 until he resigned, on April 7, 2011.  [Dkt. #35-2, Def.'s Rule 56(a)1 Stmnt. at ¶ 1; Dkt. #39-2, Pl.'s Rule 56(a)1 Stmnt. at ¶ 1].  Bean was initially hired as an Operations Specialist, working in DaVita's Northern Lights territory.  [Dkt. #6, Am. Compl. at ¶ 9].  On July 1, 2010, Bean was notified that his position would be eliminated in 60 days, at which time, Bean interviewed for an opening in DaVita's Business Development group.  [*Id.* at ¶ 11].  Bean was transferred to the Business Development group, and from September 2010 until the date of his resignation, Bean worked as a Business Development Specialist ("BDS").  [*Id.* at ¶ 12; Dkt. #35-2, Def.'s Rule 56(a)1 Stmnt. at ¶ 2; Dkt. #39-2, Pl.'s Rule 56(a)1 Stmnt. at ¶ 2]. Other than for a brief period of time at the beginning of his tenure as a BDS, Bean reported to Dennis Skrajewski ("Skrajewski").  [Dkt. #6, Am. Compl. at ¶ 20; Dkt. #35-2, Def.'s Rule 56(a)1 Stmnt. at ¶ 3; Dkt. #39-2, Pl.'s Rule 56(a)1 Stmnt. at ¶ 3].

Bean alleges that when he was transferred, he was offered in writing an annual salary of $88,000 with a guaranteed minimum first quarterly bonus of $6,000, to be paid within 60 days of the end of the quarter.  [Dkt. #6, Am. Compl. at ¶ 16].  The Defendant neither admits nor denies this allegation, asserting that the writing speaks for itself.  [Dkt. #9, Answer at ¶ 16].  The offer letter states, "You will be awarded a first quarter guaranteed bonus of $6K which will be paid out

within 60 days after the end of the quarter."  [Dkt. #39-1, Ex. D at 1].   It further states:

> Additionally, as a Business Development Specialist you will be eligible to participate in the standard BDS quarterly commission and bonus program.  Expectations related to commission and bonus will be based on performance metrics jointly developed between you and your Manager.  You will be eligible to participate in the commission and bonus program starting with your first quarter of employment.
>
> [*Id.*].

As early as December of 2010, Bean was aware that DaVita management had significant concerns about his performance.  DaVita's fourth quarter of 2010 ended on December 31, 2010.  [Dkt. #6, Am. Compl. at ¶ 29].  At the end of the fourth quarter of 2010, Bean did not receive a bonus.  [*Id.* at ¶ 76].   Indeed, Bean alleges that in December 2010, at a meeting in Atlanta, Georgia, Tom Usilton, a DaVita officer, announced that there was one individual who received zero percent of their bonus.  [*Id.* at ¶ 30; Dkt. #39-1 Pl.'s Obj. to Def.'s Mot. for Partial Summ. J., Ex. A (Dep. of David Bean), at 264:15-25].  DaVita alleges, and Bean does not dispute, that depriving a BDS of their quarterly bonus would indicate to that employee that management had a "significant concern" with their performance.  [Dkt. #39-1, Pl.'s Obj. to Def.'s Mot. for Partial Summ. J., Ex. B (Dep. of Dennis Skrajewski), at 120:17-19; Dkt. # 39, Pl.'s Obj. to Def.'s Mot. for Partial Summ. J. at 3].

As a result of his not receiving bonus compensation and related work stress, Bean alleges that he began to suffer from severe anxiety and depression. [Dkt. #6, Am. Compl. at ¶ 32].  Bean alleges that his anxiety and depression

**3**

escalated around the beginning of 2011.  [*Id.* at ¶ 35].  DaVita asserts, and Bean does not deny, that in January 2011, Bean's supervisor, Skrajewski, met with Bean regarding his job performance.  [Dkt #35-1, Def.'s Mot. for Partial Summ. J. at 2].[1]  Skrajewski requested a second meeting to occur sometime in March 2011. [Dkt. #6 Am. Compl. at ¶ 36; Dkt. #9, Answer at ¶ 36].  Skrajewski's request to meet with Bean so exacerbated his stress and anxiety that  Bean spoke with his doctor, who in turn, wrote a note stating that, effective immediately, Bean was medically unable to work.  [Dkt. #6, Am. Compl. at ¶¶ 37-38].

On March 3, 2011, Bean submitted the note from his doctor along with a request for medical leave under the FMLA to DaVita's Corporate Benefits Department.  [*Id.* at ¶ 39; Dkt. #35-2, Def.'s Rule 56(a)1 Stmnt. at ¶ 4; Dkt. #39-2, Pl.'s Rule 56(a)1 Stmnt. at ¶ 4].  DaVita granted Bean's request, and on that date, his leave became effective.   [Dkt. #35-2, Def.'s Rule 56(a)1 Stmnt. at ¶ 5; Dkt. #39-2, Pl.'s Rule 56(a)1 Stmnt. at ¶ 5].  That morning, Bean notified Skrajewski that he would not be attending a meeting, and the two exchanged emails about this cancelation.  [*Id.* at ¶¶ 6-7; Dkt #35-3, Def.'s Mot. for Partial Summ. J. at Ex. C].  In response to Bean's notification that he had "[d]eclined" a "Sales Team Homeroom Call," Skrajewski wrote, "I'm surprised by your last minute notice. Why can't you attend. [sic]  Today's an important meeting."  [Dkt #35-3, Def.'s

---

[1]  While Bean contends that "[p]rior to going out on medical leave, he had received no negative feedback nor had anyone expressed any concerns regarding his performance," [Dkt. #6, Am. Compl. at ¶ 44], he does not dispute Skrajewski's specific claim that the two met in January 2011 to discuss his job performance.

Mot. for Partial Summ. J. at Ex. C].  Four minutes later, Bean responded:
"Medically related."  [*Id.*]

Three days later, on March 6, 2011, Skrajewski sent a confidential email to
Bean reiterating the concern about Bean's performance which management had
expressed to Bean in December of 2010 and asking Bean when he expected to be
available to discuss his performance.  [Dkt. #35-2, Def.'s Rule 56(a)1 Stmnt. at ¶ 8;
Dkt. #39-2, Pl.'s Rule 56(a)1 Stmnt. at ¶ 8; Dkt #35-5, Def.'s Mot. for Partial Summ.
J. at Ex. E; Dkt. #39-1, Pl.'s Obj. to Def's. Mot. for Partial Summ. J, at Ex. C].  The
email was sent at 10:32 PM, included an attachment titled, "Q4 Commissions –
Bean.xls," and stated:

> I won't pull any bunches [sic], you had the worst
> performance of any BDS for 4Q'10 – 0 Meetings and 1
> Contact Verification, very disappointing.  Please let me
> know when you plan to return from LOA so we can sit
> down and discuss.
>
> [Dkt #35-5, Def.'s Mot. for Partial Summ. J. at Ex. E; Dkt.
> #39-1, Pl.'s Obj. to Def's. Mot. for Partial Summ. J, at Ex.
> C].

The email was intended for Bean only, as it was addressed to
him alone and included the following notice:

> CONFIDENTIALITY NOTICE: This email message is
> intended only for the use of the recipient(s) named
> above. This email and any attached files are privileged,
> confidential and may contain material protected by
> HIPAA privacy and security rules.  If you are not an
> intended recipient you may not review, copy or
> distribute this message.  If you have received this
> communication in error, please notify the sender
> immediately by email and delete the original message.
>
> [*Id.*].

While this email was critical of Bean's job performance, at no time was Bean subject to discipline pursuant to the DaVita teammate guidelines, which included verbal warnings, written warnings, suspension, or termination.  [Dkt. #39, Pl.'s Obj. to Def.'s Mot. for Partial Summ. J. at 3; Dkt. #39-1, Pl.'s Obj. to Def.'s Mot. for Partial Summ. J, Ex. B, at 80:12-20].

On March 18, 2011, Shelly Azen, an HR director, sent an email to Katherine Velasquez, another DaVita employee, regarding Bean.  [Dkt. #39-1, Pl.'s Obj. to Def.'s Mot for Partial Summ. J., Ex. B, at 89:12-22].  The email stated, "Thanks, just so you know, he was going to be terminated the day he called for LOA (he knew it) and I believe he might have another job, so I will be all over this one." [*Id.*]

Following his request for medical leave, Bean alleges that he received constant requests for meetings, requests that he update records, and requests that he do work despite his being on leave.  [Dkt. #6, Am. Compl. at ¶ 47].  The requests for meetings and work which Bean could recall came from Bean's supervisor, Skrajewski, in the form of his March 6, 2011 email, and voicemails from DaVita's regional operations directors for upstate New York, Long Island, and New York City.  [Dkt. #35-2, Def.'s Rule 56(a)1 Stmnt. at ¶¶ 12, 15; Dkt. #39-2, Pl.'s Rule 56(a)1 Stmnt. at ¶¶ 12, 15].  However, none of these coworkers who contacted him while he was on FMLA leave (other than his supervisor Skrajewski), were aware that he was on such leave at the time.  [*Id.* at ¶ 10].  Bean does not remember from whom he received requests to update records while he

was on leave, whether these requests were in writing, or whether he ever had any

documentation of such requests.  [*Id*. at ¶ 14].

On April 7, 2011, Bean sent to Skrajewski a letter of resignation.  [*Id*. at ¶

17; Dkt #35-5, Def.'s Mot. for Partial Summ. J. at Ex. F].  In that letter, Bean stated:

> [E]ffective immediately I am resigning from my position
> as Business Development Specialist at DaVita.  While
> employed at DaVita, I have been subjected to an
> environment that has become intolerable to continue to
> be apart [sic] of.  The conditions have been
> intentionally created and supported by you and other
> members of the so-called 'team' at DaVita.  This
> subsequently has negatively affected my health and
> prompted me to resign.

> [*Id*.].

Thereafter, Bean filed this retaliation action.

III.    Legal Standard

a.  Summary Judgment

Summary judgment should be granted "if the movant shows that there is

no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of

proving that no factual issues exist.  *Vivenzio v. City of Syracuse,* 611 F.3d 98,

106 (2d Cir. 2010).  "In determining whether that burden has been met, the court is

required to resolve all ambiguities and credit all factual inferences that could be

drawn in favor of the party against whom summary judgment is sought."  *Id.*

(citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S. Ct. 2505, 91

L.Ed.2d 202 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S.

574, 587, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986)).  "If there is any evidence in the

record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH,* 446 F.3d 313, 315–16 (2d Cir. 2006) (internal quotation marks and citation omitted).  In addition, determinations of the weight to accord evidence or assessments of the credibility of witnesses are improper on a motion for summary judgment, as such are within the sole province of the jury.  *Hayes v. New York City Dep't of Corr.,* 84 F. 3d 614, 619 (2d Cir. 1996).

"A party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.  At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient."  *Welch–Rubin v. Sandals Corp.,* No.3:03cv481, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (internal quotation marks and citations omitted); *Martinez v. State of Connecticut*, No. 3:09cv1341 (VLB), 2011 WL 4396704 at *6 (D. Conn. Sept. 21, 2011).  Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie.  *Fincher v. Depository Trust and Clearance Co.,* 604 F.3d 712 (2d Cir. 2010).

### b. Retaliation Under the FMLA

Retaliation claims brought under the FMLA are examined under the *McDonnell Douglas* three-step burden-shifting analysis developed in the Title VII context. *Potenza v. City of New York*, 365 F. 3d 165, 168 (2d Cir. 2004). Under the first step of this analysis, a plaintiff must make out a *prima facie* case of discrimination, by establishing that: (i) he exercised rights protected under the FMLA; (ii) he was qualified for his position; (iii) he suffered an adverse employment action; and (iv) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent. *Id.* The plaintiff's burden in establishing a *prima facie* case "is *de minimis*, and the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Hicks v. Baines*, 593 F. 3d 159, 164 (2d Cir. 2010). If a plaintiff establishes a *prima facie* case, "a presumption of retaliation arises." *Jute v. Hamilton Sundstrand Corp.*, 420 F. 3d 166, 173 (2d Cir. 2005). The burden then shifts to the employer to "articulate a legitimate, non-retaliatory reason for the adverse employment action." *Id.* If the employer does so, "the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action." *Id.*

DaVita does not contest that Bean has established the first two elements of its *prima facie* case. Accordingly, in assessing Bean's *prima facie* case, the Court considers only whether Bean has put forth evidence sufficient to show that he suffered an adverse employment action and, if so, that the adverse

employment action occurred under circumstances giving rise to an inference of retaliatory intent.

IV.   <u>Analysis</u>

    a.   <u>Skrajewski's Informal E-mail Expressing Disappointment in Bean's Job Performance Was Not An Adverse Employment Action</u>.

To support a retaliation claim, an adverse employment action must be one that would have been materially adverse to a reasonable employee. *See Millea v. Metro-North R.R. Co.*, 658 F. 3d 154, 164 (2d Cir. 2011). To qualify as materially adverse, the employment action must be one which would "have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (quoting *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006)). While the employment action need not be limited "to the specific terms and conditions of the employee's employment," *id.*, in order to qualify as materially adverse, "[p]etty slights, minor annoyances, and simple lack of good manners will not give rise to actionable retaliation claims." *Id.* at 165 (quotation and citation omitted).

Among the employment actions the Second Circuit has found to be materially adverse are formal reprimands. *See id.* This is because such reprimands "can reduce an employee's likelihood of receiving future bonuses, raises, and promotions," and they "may lead the employee to believe (correctly or not) that his job is in jeopardy." *Id.* Even where the formal reprimand "does not directly or immediately result in any loss of wages or benefits, and does not remain in the employment file permanently," a plaintiff may rely on a formal

reprimand as an adverse employment action under *McDonnell Douglas*.  *Id*. (noting that "a reasonable jury could conclude" that such a formal reprimand could deter a reasonable employee from exercising his FMLA rights).

However, not all criticism of an employee's job performance rises to the level of a reprimand that is materially adverse under the FMLA.  For instance, the Second Circuit has held that conduct short of a formal reprimand in an employment file, like "criticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action."  *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F. 3d 556, 570 (2d Cir. 2011).   Accordingly, the Second Circuit advises that "[m]aterial adversity is to be determined objectively, based on the reactions of a reasonable employee."  *Tepperwien*, 663 F. 3d at 568.  "Context matters, as some actions may take on more or less significance depending on the context."  *Id*. (quotations and citation omitted).  As a result, "[a]lleged acts of retaliation must be evaluated both separately and in the aggregate, as even trivial acts may take on greater significance when they are viewed as part of a larger course of conduct."  *Id*.

Here, Bean relies exclusively on his supervisor's March 6, 2011 email—sent three days after Bean was granted his FMLA leave—to establish that he suffered an adverse employment action.  *See* [Dkt. #39, Pl.'s Obj. to Def.'s Mot. for Partial Summ. J. at 7-11].  Bean's reliance is misplaced for at least two reasons.

First, the email Bean received from his supervisor, Skrajewski, was not a formal notice of reprimand.  It was an email Skrajewski penned at 10:32 PM, attaching an Excel file which purports to contain the commissions earned by some or all of Bean's fellow BDSes.  *See* [Dkt #35-5, Def.'s Mot. for Partial Summ. J. at Ex. E].  While the body of Skrajewski's email stated that Bean "had the worst performance of any BDS for 4Q '10" and that Bean's performance was "very disappointing," [*id.*], nowhere does the email indicate that it constitutes an official formal notice of reprimand or discipline; nor does it reference any of DaVita's employee guidelines.  Indeed, as Skrajewski testified (which Bean relies upon in his Objection), at no time was Bean subject to discipline pursuant to the DaVita teammate guidelines, which included verbal warnings, written warnings, suspension, or termination.  [Dkt. #39, Pl.'s Obj. to Def.'s Mot. for Partial Summ. J. at 3; Dkt. #39-1, Pl.'s Obj. to Def.'s Mot. for Partial Summ. J, Ex. B, at 80:12-20].  In addition, unlike the formal reprimand at issue in *Millea*, a case Bean relies upon heavily, *see* [Dkt. #39, Pl.'s Obj. to Def.'s Mot. for Partial Summ. J. at 8-11], nowhere in Skrajewski's email (nor elsewhere in the record) is there any indication that this email would be placed in Bean's employment file, or would otherwise be a part of his employee record at DaVita.  Bean has cited no facts establishing an objectively reasonable basis for him to believe that this confidential email sent to him alone would "reduce [his] likelihood of receiving future bonuses, raises, and promotions, [or] that . . . his job [wa]s in jeopardy." *Millea*, 658 F. 3d 165.[2]  Under these circumstances, Bean's analogy to *Millea*, and

---

[2]  As noted above, Bean readily acknowledges that he knew of management's

his position that this email constitutes an adverse employment action, is untenable.  *See Watson v. Geithner*, Nos. 09 Civ. 6624(HBP), 10 Civ. 3948(HBP), 10 Civ. 7282(HBP), 2013 WL 5420932, at *13-14 (S.D.N.Y. Sept. 27, 2013) (finding that plaintiff failed to offer a materially adverse action where plaintiff relied on a form containing negative information which was "not a formal letter of reprimand" and stating that such form merely "criticized [plaintiff] for her work performance, which is not a materially adverse employment action").

Second, contrary to Bean's assertion that this email "points to discipline up to and including termination," [Dkt. #39, Pl.'s Obj. to Def.'s Mot. for Partial Summ. J. at 4], nowhere does the email indicate that Bean was to be subject to *any* type of discipline as a result of his sales performance.  *See* [Dkt #35-5, Def.'s Mot. for Partial Summ. J. at Ex. E].

Skrajewski simply asks Bean to inform him when he plans to return from his FMLA leave of absence in order to "sit down and discuss" Bean's performance.  [*Id.*].  Neither this email, nor any other evidence in the record, even suggests that this post-leave reprimand was to be accompanied by any negative consequences.  While Bean is correct in asserting that, under *Millea*, a plaintiff need not have actually suffered negative consequences, beyond the reprimand itself, in order to establish an adverse employment action, *see* Millea, 658 F. 3d at 160 (stating that the reprimand letter "was expunged after a year" and that the plaintiff "had no further disciplinary incidents"), *Millea* does not address a

---

dissatisfaction with his performance before March 3, 2010, when he requested and was approved to take FMLA leave.  *See supra* at 3.

situation, like the one before this Court, where a plaintiff receives a reprimand which offers no colorable basis upon which to conclude that negative consequences are reasonably likely to occur.  Without such indication, it is difficult to see how an email like this one could "dissuade[] a reasonable worker from making or supporting a charge of discrimination."  *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006).

In addition to *Millea*, Bean cites three cases in support of his position that a reprimand like the one he received is sufficient to constitute an adverse employment action.  *See* [Dkt. #39, Pl.'s Obj. to Def.'s Mot. for Partial Summ. J. at 10-11].  None of these cases are apposite.

First, Bean cites to *Santora v. All About You Home Care Collaborative Health Care SVC, LLC*, No. 3:09CV00339, 2012 WL 1964965 (D. Conn. May 31, 2012).[3]  Unlike the email he received from Skrajewski, the reprimand the plaintiff in *Santora* received plainly brought with it negative consequences, namely, she "stopped being given work assignments."  *Id.* at *4.  Thus, the *Santora* Court concluded that the plaintiff suffered "a change in the terms and conditions of her employment."  *Id.* at *3.  Here, Bean readily admits that Skrajewski's email "did not produce negative consequences."  [Dkt. #39, Pl.'s Obj. to Def.'s Mot. for Partial Summ. J. at 9].

---

[3] While Bean cites to a related opinion, *Santora v. All About You Home Care Collaborative Health Care SVC, LLC*, No. 3:09CV00339, 2010 WL 4942665 (D. Conn. Nov. 23, 2010), in his Objection, *see* [Dkt. #39, Pl.'s Obj. to Def.'s Mot. for Partial Summ. J. at 10], the language Bean quotes and the date he lists in his citation make clear that he is referring to the later opinion discussed above.

14

Bean next cites to *Abraham v. Potter*, 494 F. Supp. 2d 141 (D. Conn 2007). In *Abraham*, the plaintiff received a "seven-day 'paper' suspension" which the Court viewed as "a more serious action than a formal, written reprimand, as it is the second step in the progressive discipline process" and "had an equivalent degree of seriousness as if [the plaintiff] had been suspended without pay." *Id.* at 148. Again, Bean suffered no negative consequences as a result of the email he received, nor could he contend that the email from Skrajewski was more serious than a formal, written reprimand. Indeed, at no time was Bean subject to discipline pursuant to DaVita's formal guidelines. *See* [Dkt. #39, Pl.'s Obj. to Def.'s Mot. for Partial Summ. J. at 3; Dkt. #39-1, Pl.'s Obj. to Def.'s Mot. for Partial Summ. J, Ex. B, at 80:12-20].

Finally, Bean cites to *Ruhling v. Newsday, Inc.*, No. CV 04-2430, 2008 WL 2065811 (E.D.N.Y. May 13, 2008). As a preliminary matter, *Ruhling* arose in the context of a "state law disability discrimination claim." *Id.* at *4. *Ruhling* is also factually inapposite, because the written reprimand the plaintiff received "was essentially the equivalent of two strikes in baseball," and "following the reprimand, [plaintiff's employer] felt justified in suspending plaintiff without pay for her next perceived infraction." *Id.* at *5.

While Bean relies exclusively on the March 6, 2011 email to establish that he suffered an adverse employment action, *see* [Dkt. #39, Pl.'s Obj. to Def.'s Mot. for Partial Summ. J. at 7-11], the Court further notes that nearly all of the conduct Bean complains about occurred *before* he took his FMLA leave on March 3, 2011, including, DaVita's decision to decline to pay him any bonus, DaVita's alleged

15

public announcement that Bean would not be receiving a bonus, and Skrajewski's statement that he wanted to fly out and meet with Bean alone. *See* [Dkt. #6, Am. Compl. at ¶¶ 29, 36-38; Dkt. #39, Pl.'s Obj. to Def.'s Mot. for Partial Summ. J. at 2-4].

Bean's only post-leave complaints (aside from the March 6, 2011 email), that he "received constant requests for meetings, requests that [he] update records, and requests that [he] do work despite his being on leave," [Dkt. #6, Am. Compl. at ¶ 47], and the vague references in his resignation letter to an "intentionally created" work "environment that has become intolerable," [Dkt #35-5, Def.'s Mot. for Partial Summ. J. at Ex. F], are insufficient to establish an adverse employment action, whether viewed separately or together. As to the requests to perform post-leave work, Bean knew at the time that the coworkers who made these requests, aside from Skrajewski (who did so once in his March 6 email), were unaware that he was on FMLA leave. [Dkt. #35-2, Def.'s Rule 56(a)1 Stmnt. at ¶ 10; Dkt. #39-2, Pl.'s Rule 56(a)1 Stmnt. at ¶ 10]. In addition, the requests to perform work were not accompanied by direct threats or stated consequences for failure to perform the requested tasks. *Cf. Zahler v. Empire Merchants, LLC*, No. 11-CV-3163 (JG) (CLP), 2012 WL 273698, at *9 (E.D.N.Y. Jan. 31, 2012) (noting that a request for work while a plaintiff is on leave "could plausibly constitute a materially adverse employment action under the new *Millea* standard" but considering this in the context of a work request made by a superior in a "demanding" phone call and under "the threat of forfeiting [a business] account" if the work was not completed). Similarly, while an

intentionally created hostile work environment as a result of an FMLA leave could serve as an adverse employment action, Bean's vague, conclusory statements in his resignation letter offer no concrete facts about his work environment, most significantly, when this environment was created.  *See, e.g., Henry v. NYC Health & Hosp. Corp.*, No. 13 Civ. 6909(PAE), 2014 WL 957074, at \*5 (S.D.N.Y. Mar. 10, 2014) (noting that while a denial of overtime may rise to the level of an adverse employment action plaintiff's "conclusory allegations that she was denied overtime, without more, is insufficient to substantiate an adverse employment action").

Finally, Bean submits, but does not rely upon, a March 18, 2011 post-leave email conversation between two DaVita employees, which states that Bean "was going to be terminated the day he called for [FMLA leave] (he knew it) and I believe he might have another job, so I will be all over this one."  [Dkt. #39-1, Pl.'s Obj. to Def.'s Mot for Partial Summ. J., Ex. B, at 89:12-22].  Certainly, a termination would be an adverse employment action, but this email cannot serve as an adverse employment action for several reasons.  First, there is no dispute that Bean voluntarily resigned from his position.   [Dkt. #35-2, Def.'s Rule 56(a)1 Stmnt. at ¶¶ 17-18; Dkt. #39-2, Pl.'s Rule 56(a)1 Stmnt. at ¶¶ 17-18].  Second, there is no evidence in the record that either Bean or Skrajewski were aware of this email prior to this litigation.[4]   Third, the language of the email makes clear that

---

[4] In its Reply, DaVita asserts that "Skrajewski had not engaged in any communication with [the author of the email] regarding a planned termination before he sent the 3/6/11 Email."  [Dkt. #42, Def.'s Reply, at 8].  DaVita also referenced what appear to be additional portions of Skrajewski's deposition

any discussions to terminate Bean had occurred prior to his leave request. Indeed, the email insinuates that Bean knew about his possible termination prior to making his request.

**b.** <u>Bean Fails to Establish Retaliatory Intent</u>

Even if Skrajewski's March 6, 2011 email, or one of his other post-leave complaints, could constitute an adverse employment action, Bean's retaliation claim still fails because he has not demonstrated retaliatory intent.

While Bean correctly contends that "temporal proximity may give rise to an inference of retaliation for the purposes of establishing a prima facie case," *El Sayed v. Hilton Hotels Corp.*, 627 F. 3d 931, 933 (2d Cir. 2010), "[w]here timing is the only basis for a claim for retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Colon v. Fashion Inst. of Tech.*, 983 F. Supp. 2d 277, 287 (S.D.N.Y. 2013) (quoting *Slattery v. Swiss Reins. Am. Corp.*, 248 F. 3d 87, 95 (2d Cir. 2001)). Here, the events leading up to the March 6, 2011 email render him unable to establish an inference of retaliatory intent.

Bean was on notice as early as December 2010, that management had "a significant concern with [his] performance," when he was not awarded a fourth quarter bonus. [Dkt. #39-1, Pl.'s Obj. to Def.'s Mot. for Partial Summ. J., Ex. B, at 120:17-19; Dkt. # 39, Pl.'s Obj. to Def's. Mot. for Partial Summ. J. at 3]. DaVita made its concerns further apparent prior to Bean's leave when Skrajewski

transcript, in which Skrajewski testified that he had not spoken with the author of the email about terminating Bean prior to her writing it. *See* [*id.* at 8-9].

sought to meet with him twice to discuss his job performance.  *See* [Dkt. #6, Am. Compl. at ¶ 36; Dkt #35-1, Def.'s Mot. for Partial Summ. J. at 2].  Bean also received Skrajewski's disappointed response to his email notifying him that he would not be able to attend a team call early in the morning on the day he put in for his FMLA leave.  [Dkt. #35-2, Def.'s Rule 56(a)1 Stmnt. at ¶¶ 4-7; Dkt. #39-2, Pl.'s Rule 56(a)1 Stmnt. at ¶¶ 4-7; Dkt #35-3, Def.'s Mot. for Partial Summ. J. at Ex. C].  Given these prior communications, Skrajewski's March 6, 2011 email criticizing Bean's performance and requesting a meeting upon Bean's return from his FMLA leave was "part, and the ultimate product, of an extensive period of progressive discipline" which began at least 2 months before he filed for leave.  *Slattery*, 248 F. 3d at 95.[5]

Bean's two arguments in opposition each fail.  Bean claims that Skrajewski's testimony about his email, which he characterized as "poor," "against policy," and stated that "he made a mistake" when he sent it out of "frustration," [Dkt. # 39, Pl.'s Obj. to Def's. Mot. for Partial Summ. J. at 14], "conflicts directly with [DaVita's] argument that [] Skrajewski intended to convey a 'criticism.'"  [*Id*. at 16].  However, Skrajewski's characterizations of his email years later are simply not probative of his state of mind at the time he wrote the email.  To the extent that Skrajewski's testimony is probative of his state of mind,

---

[5] To the extent Bean's adverse employment action rests on his coworkers' requests for work during his leave, *see* [Dkt. #6, Am. Compl. at ¶ 47], their lack of knowledge of his leave at the time of the requests undercuts any claim of retaliatory intent.  *See Shah v. Eclipsys Corp.*, No. 08-CV-2528, 2010 WL 2710618, at *12 (E.D.N.Y. Jul. 7, 2010) (granting summary judgment on FMLA claim where "there is no evidence [the decisionmaker] even knew that plaintiff had requested FMLA leave").

it is not indicative of a retaliatory state of mind.  Skrajewski's email is indicative
of his frustration that he was unable to schedule a meeting with Bean; not that he
was unable to meet with Bean.  Had Skrajewski been frustrated because he was
unable to meet with Bean, Skrajewski would have pressured Bean to return to
work.  The email does not pressure Bean to return to work; it merely asks Bean to
let Skrajewski know for when he could schedule a meeting.  None of these
statements suggests a retaliatory motive or is otherwise inconsistent with
Skrajewski's explanation that he intended to convey criticism to Bean.

Bean's reliance on the March 18, 2011 email from DaVita employee, Shelly
Azen, stating her belief that Bean was going to be terminated on March 3, 2011,
[Dkt. # 39, Pl.'s Obj. to Def's. Mot. for Partial Summ. J. at 16-17], is similarly
misplaced because there is no evidence in the record that Skrajewski, the author
of the written reprimand Bean relies upon, was even aware of it at the time he
sent his email.  See [Dkt. #42, Def.'s Reply, at 8-9].  In addition, even if he was and
knew that DaVita had been planning to terminate Bean on the day Bean gave
notice of his leave, this does not undercut DaVita's claim that the email was sent
as a result of Bean's poor job performance.  If anything, the fact that this decision
was plainly reached prior to the day Bean requested his leave, supports DaVita's
nondiscriminatory explanation.

For the same reasons, even if Bean is found to have met the low hurdle of
setting forth a *prima facie* case, his post-leave allegations do not come close to
carrying his burden of establishing that DaVita's proffered reason for this email,
*i.e.*, Bean's job performance, was a pretext because Bean's serious performance

**20**

deficiencies had been identified by DaVita management and brought to Bean's attention months prior to his FMLA leave request and absence.

### c.  The Court Declines to Exercise Supplemental Jurisdiction Over Plaintiff's Remaining State Law Claims

Having disposed of Bean's sole claim under federal law, the Court declines to exercise supplemental jurisdiction over his remaining state law claims, which is "the practice preferred by appellate courts." *N.K. ex rel. Kelly v. Morrison*, No. 3:11-CV-1977 (CSH), 2014 WL 4388552, at *5 (D. Conn. Sept. 5, 2014).

While Bean also asserts subject-matter jurisdiction under 28 U.S.C. § 1343, this "section does not in itself create a cause of action," *Townsend v. Public Storage Inc.*, No. 1:13-cv-01600 (TJM/TWD), 2014 WL 1764432, at *4 n.3 (N.D.N.Y. Apr. 30, 2014), and the only federal claim Bean raises in his Complaint is his claim for retaliation under the FMLA.  *See* [Dkt. #6, Am. Compl. at ¶¶ 51-59.  In addition, Bean does not allege any facts to support a conclusion that the retaliatory conduct he allegedly suffered "was done in furtherance of a conspiracy, under color of state law, or pursuant to any other grounds providing jurisdiction under 28 U.S.C. § 1343." *Pearson v. Unification Theological Seminary*, 785 F. Supp. 2d 141, 164 (S.D.N.Y. 2011) (declining to find jurisdiction under § 1343 for defendant's remaining state law claim after dismissing FMLA retaliation and other federal claims).  Indeed, Bean does not allege—nor does the record support—a conspiracy between and among employees at DaVita.

**V.**      **Conclusion**

For the foregoing reasons, Defendant's Partial Motion for Summary Judgment is GRANTED as to Plaintiff's retaliation claim under the FMLA and is otherwise DENIED.  Plaintiff's remaining claims are DISMISSED without prejudice. The Clerk is directed to enter judgment in favor of the Defendant and to close the case.

**IT IS SO ORDERED.**

_____/s/_____
**Hon. Vanessa L. Bryant**
**United States District Judge**

**Dated at Hartford, Connecticut: September 30, 2014**